IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHESTER D. LAMBERT, JR., and DONNA FAYE LAMBERT, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CIVIL NO. 04-347-GPM ) |
| B.P. PRODUCTS NORTH AMERICA, INC., CONOCO PHILLIPS COMPANY, SHELL OIL COMPANY, ASHLAND OIL, INC., EXXON MOBIL OIL CORPORATION, ATLANTIC RICHFIELD COMPANY a/k/a ARCO PRODUCTS COMPANY, and MAYTAG AIRCRAFT CORPORATION, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

This matter is before the Court on a motion for summary judgment brought by Defendant Shell Oil Company ("Shell"). For the following reasons, the motion is **DENIED**.

## BACKGROUND

Plaintiff Chester Lambert, Jr., served in the United States Marine Corps as a jet engine mechanic from 1971 to 1989. From January 1, 1983, to April 4, 1989, Mr. Lambert was stationed in Yuma, Arizona, where in the course of his employment he was frequently exposed to JP-4 jet fuel manufactured by Shell. In May 2003 Mr. Lambert was diagnosed with chronic lymphocytic leukemia. The Department of Veterans Affairs found Mr. Lambert's leukemia to be service-related.

Mr. Lambert and his wife filed this lawsuit in Illinois state court, alleging that Mr. Lambert's leukemia is the result of exposure to excessive levels of benzene in JP-4. The Lamberts' complaint asserts claims against Shell for defective manufacture and failure to warn that sound in negligence and strict products liability. The case was removed to this Court on the basis of so-called "federal enclave" jurisdiction, *see* 28 U.S.C. § 1331; *Sinicki v. General Elec. Co.*, No. 1:05-CV-508, 2005 WL 1592961, at *1 (N.D.N.Y. July 7, 2005), and so-called "federal officer" jurisdiction. *See* 28 U.S.C. § 1442.

Shell seeks summary judgment on four grounds. First, Shell contends that it discharged its duty to warn by sending a Material Safety Data Sheet ("MSDS") to the United States, a sophisticated purchaser of JP-4, in 1985 and 1988. Second, Shell contends that any purported failure to adequately warn in its 1985 and 1988 MSDS of the health hazards of its product was not the cause of Mr. Lambert's injuries because Mr. Lambert admits he never read any MSDS issued by Shell or any other product information about Shell's JP-4 fuel. Third, Shell argues that it is immune from liability under the "military contractor defense" because it produced JP-4 in conformity with detailed military specifications and warned the United States about the purported hazards of the product for those who were to come in contact with it. Finally, by way of its reply brief in support of its motion for summary judgment, Shell contends that Mr. Lambert has failed to show that he was exposed to JP-4 manufactured by Shell while he was stationed in Arizona.

## DISCUSSION

### A.    Legal Standard

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  In considering a summary judgment motion, a court must review the entire record and draw all reasonable inferences in the light most favorable to the non-moving party.  *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981).  On summary judgment a court may not make credibility determinations or weigh the evidence, because these are tasks for a factfinder. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1138 (7th Cir. 1994).  In evaluating a motion for summary judgment, "[t]he court has one task and one task only:  to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

  **B.**  **The Sophisticated Purchaser Defense**

  The sophisticated purchaser defense to a failure-to-warn claim brought under negligence or strict liability theories provides that product suppliers do not have a duty to warn employees or customers of knowledgeable industrial purchasers as to product-related hazards.  *See Ritchie v. Glidden Co.*, 242 F.3d 713, 724 (7th Cir. 2001) (applying Indiana law).  Put another way, suppliers have no duty to warn where the plaintiff's employer is a sophisticated user of the product and is in the best position to warn employees of the product's dangers; the supplier remains under a duty to warn end-users, but it can rely on a knowledgeable employer to convey the warnings of the hazard. *See* Restatement (Second) of Torts § 388 cmt. n (1965).

  The parties are in agreement that the issue of the sophisticated purchaser defense vis-a-vis the Lamberts and Shell is controlled by Arizona law, because Arizona is where Mr. Lambert was

exposed to benzene in JP-4 manufactured by Shell. As a matter of federal law, wrongful death or personal injury actions that arise in a national park or other place subject to the exclusive jurisdiction of the United States are governed by the law of the state in which the federal enclave is located. *See* 16 U.S.C. § 457.[1] In evaluating the applicability of the sophisticated purchaser defense, Arizona courts consider numerous factors, including, "[t]he likelihood or unlikelihood that harm will occur if the vendee does not pass on the warning to the ultimate user, the trivial or substantial nature of the probable harm, the probability or improbability that the particular vendee will not pass on the warning and the ease or burden of the giving of warning by the manufacturer to the ultimate user." *Dole Food Co. v. North Carolina Foam Indus., Inc.*, 935 P.2d 876, 881 (Ariz. Ct. App. 1996) (quoting *Shell Oil Co. v. Gutierrez*, 581 P.2d 271, 278 (Ariz. Ct. App. 1978)).

Shell's invocation of the sophisticated purchaser defense relies on two premises: first, that the United States is *per se* a sophisticated purchaser and, second, that as a bulk supplier of JP-4, Shell could only have discharged its duty to warn by giving notice to the United States. The Court declines to hold that the United States is in every time and season a sophisticated purchaser.

---

1. The same result would obtain if the Court applied conflict-of-laws principles under federal common law, Arizona law, and Illinois law, all of which direct the Court to consult the Restatement (Second) of Conflict of Laws (1971). *See Morewitz v. West of England Ship Owners Mut. Prot. & Indem. Ass'n (Luxembourg)*, 62 F.3d 1356, 1363 n.13 (11th Cir. 1995) (the federal common law of conflict of laws is furnished by the Restatement (Second) of Conflict of Laws); *Bates v. Superior Court, Maricopa County*, 749 P.2d 1367, 1370-72 (Ariz. 1988) (applying the Restatement (Second) of Conflict of Laws); *Ingersoll v. Klein*, 262 N.E.2d 593, 595-96 (Ill. 1970) (same). Under the Restatement, in personal injury cases the law of the place of injury presumptively controls unless another state has a more significant relationship to the occurrence and the parties. *See* Restatement (Second) of Conflict of Laws § 145, 146. *See also In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 644 F.2d 594, 611 (7th Cir. 1981). In this instance there is no dispute that Mr. Lambert's alleged injury by Shell occurred in Arizona and that any relationship between the Lamberts and Shell is centered there. *See* Restatement (Second) of Conflict of Laws § 145. Because no other state has been shown to have a more significant relationship to the injury, Arizona law presumptively is controlling.

Arizona law clearly contemplates resolution of the question of whether a given employer is a sophisticated purchaser through a fact-intensive, case-by-case inquiry. "It is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe." *Shell Oil*, 581 P.2d at 278 (quoting Restatement (Second) of Torts § 388 cmt. n).

Likewise, in *Shell Oil* the court specifically rejected the argument that Shell, by virtue of being a bulk supplier, automatically discharged its duty to warn by giving notice of a defect in a product to a plaintiff's employer. In *Shell Oil*, a welder was injured when an empty liquid xylene drum exploded. Shell, the manufacturer of the xylene, argued that, as a bulk supplier of xylene in carload lots without direct access to the packaging of its product in barrels, it could not reasonably be expected to give warning to end-users of the xylene. The court disagreed, saying, "Shell being a bulk supplier in carload lots and not having direct access to the barrels does not insulate it from liability. Labeling the container is but one of the methods which may give adequate warning. Lack of access to the final form in which the product reaches the user is simply one of the considerations bearing upon the existence and extent of duty." 581 P.2d at 279 (citation omitted).

The Court concludes that, in this instance, "[t]he determination as to whether the supplier's duty . . . has been reasonably discharge[d] comes within the function of the trier of fact." *Shell Oil*, 581 P.2d at 279. *See also Dole Food*, 935 P.2d at 881 ("Whether [the] manufacturer has discharged his duty, considering [the relevant] factors, is a question for the trier of fact."). The record shows that Shell did not warn the United States about the toxicity of benzene in Shell's JP-4 jet fuel until

December 1985, nearly three years after Mr. Lambert began working with the product. The record shows also a question of fact as to the adequacy of the warning Shell gave to the United States in 1985. As the Lamberts' counsel points out, the MSDS Shell delivered to the United States in 1985 stated: "Repeated high level benzene exposure may produce injury of the blood-forming tissues causing blood abnormalities and possibly leukemia; however, exposures to such high levels are not likely to be encountered in JP-4 vapor due to the low benzene content." Pls.' Mem. Law Opp. Def. Shell's Mot. Summ. J., Ex. C. Notably, a later MSDS issued by Shell in 1988 concerning JP-4 substantially revised the language of the 1985 MSDS: "Prolonged and repeated benzene exposure may cause serious injury to blood forming organs: benzene is suspected of carcinogenic (leukemia) potential in man. Benzene is listed by the National Toxicology Program, the International Agency for Research on Cancer, and OSHA as a chemical causally associated with cancer in humans." *Id.*, Ex. D.

Although Shell contends that the United States performed studies of the toxicity of benzene in JP-4, these studies are not part of the record, and any attempt by the Court to divine what the United States knew or did not know about the toxicity of JP-4 manufactured by Shell would amount to speculation. The fact that Mr. Lambert testified that he does not recall ever seeing an MSDS regarding Shell's JP-4 casts further doubt on the reasonableness of Shell's reliance on the United States to give warning to end-users of Shell's product. *See Dole Food*, 935 P.2d at 881-82 (in a strict products liability action by the owner of a building that was damaged when a welding spark ignited the building's insulation, finding a genuine issue of material fact precluding summary judgment for a polyurethane foam insulation supplier as to whether the supplier satisfied its duty to warn by giving warnings to a contractor who installed the supplier's insulation in the plaintiff's

building, in light of evidence that the supplier made no effort to ensure that the contractor transmitted information regarding the insulation's hazards to the building owner). *See also Taylor v. Monsanto Co.*, 150 F.3d 806, 808 (7th Cir. 1998) (applying Indiana law) ("In order for the [sophisticated purchaser] exception to apply . . . , the [purchaser] must have knowledge or sophistication equal to that of the manufacturer, and the manufacturer must be able to rely reasonably on the [purchaser] to warn the ultimate consumer."). Likewise, although Shell contends that as a bulk supplier it had no way of knowing the final destination of the JP-4 it supplied to the United States, Mr. Lambert specifically testified that Shell tanker trucks frequently visited the military base where he was stationed in Arizona, suggesting that Shell could have attempted to identify and warn potential end-users of its product, such as Mr. Lambert. *See Dole Food*, 935 P.2d at 881-82 (finding a genuine issue of material fact as to whether a supplier satisfied its duty to warn by giving warnings to a contractor, in light of evidence that the supplier's personal contact with ultimate consumers of the supplier's product was an available avenue of communication).

Finally, the Court notes that benzene is a carcinogen for which there is no known safe level of exposure. *See Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 613 (1980); *American Petroleum Inst. v. OSHA*, 581 F.2d 493, 496 (5th Cir. 1978). Under the circumstances of this case, it is not for the Court to decide what sort of warnings were necessary to discharge Shell's duty to end-users of its JP-4. The Lamberts' counsel has pointed out various measures Shell might have taken to ensure adequate warning, and the Court will not add to that recitation. "[W]hether a manufacturer has adequately discharged its duty to warn to qualify for the sophisticated [purchaser] defense is a question for the trier of fact." *Ritchie*, 242 F.3d at 724 (citing *Dole Food*, 935 P.2d at 881). It is the province of the jury to decide what measures Shell could have

or should have taken to protect end-users of its JP-4 fuel such as Mr. Lambert. Summary judgment as to Shell's sophisticated purchaser defense will be denied.

### C. Mr. Lambert's Alleged Failure to Read Warnings

Shell contends also that the Lamberts cannot prove causation because Mr. Lambert admitted during a deposition that he never read Shell's MSDS regarding JP-4. Shell mischaracterizes Mr. Lambert's testimony. What Mr. Lambert actually testified to was that he never *saw* an MSDS for Shell's JP-4:

> Q. . . . During the course of your military career were you ever taught about, or did you ever learn about the importance of having adequate ventilation in your work area?
> A. Adequate ventilation? I don't recall ever seeing anything. If you are working with a chemical, a severe chemical, something like methyl ethyl ketone or something like that, something serious like that, I think it's written on the side of the can. But I don't recall ever having any kind of training like that, except for if you are working with those.
> Like when we had a safety stand-down, they would bring it up if you are going to use something like that. But nobody ever, in my entire career, ever said anything about fuel and proper ventilation within that building, or working out on the jets. The only thing that was mentioned was no smoking, for common sense reasons.
> Q. Do you know what an MSDS sheet is?
> A. No, sir. I never saw one.
> Q. Did you ever see any written documentation or warnings regarding JP-4 jet fuel?
> A. No, sir.
> Q. From any source whatsoever?
> A. No, sir. Never.

Def. Shell Oil Co.'s Mem. Law Supp. Mot. Summ. J., Ex. B. Also, as discussed, it is not disputed that any warning by Shell in the form of an MSDS regarding JP-4 did not come until nearly three years after Mr. Lambert began working with JP-4 manufactured by Shell. In light of Mr. Lambert's testimony, the Court fails to see how a complete lack of warning can be deemed adequate warning. *See Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 358 (7th Cir. 1996) (noting that summary judgment

is not appropriate to resolve a "swearing contest").

Further, as the Lamberts' counsel points out, under Arizona law there is a presumption in cases involving alleged failure to warn that, had adequate warning been given, it would have been heeded. "The 'heeding presumption' is a rebuttable presumption used in a strict liability information defect case to allow the fact-finder to presume that the person injured by product use would have heeded an adequate warning, if given. The presumption is useful to plaintiffs in such cases, as it might otherwise be difficult to demonstrate how an injured or deceased person would have reacted to a given warning." *Golonka v. General Motors Corp.*, 65 P.3d 956, 967 (Ariz. Ct. App. 2003) (citation omitted). "[U]se of the heeding presumption in strict liability failure-to-warn cases furthers Arizona's policy of protecting the public from defective and unreasonably dangerous products. The presumption is also procedurally desirable to ensure that legitimate claims of information defect are fairly addressed." *Id*. at 969.[2]

"[W]here warning is given, the seller may reasonably assume that it will be read and heeded . . . . The presumption works both ways: It works in favor of the seller when an adequate warning is given, but favors the plaintiff when an adequate warning is not given." *Dole Food*, 935 P.2d at 883 (quoting Restatement (Second) of Torts § 402A cmt. j). Accordingly, in the absence of evidence that a plaintiff would have ignored warnings had they been given, there is a rebuttable

---

2. As discussed, 16 U.S.C. § 457 mandates the application of Arizona law to the Lamberts' claims against Shell. To the extent any conflict-of-laws considerations apply, the Court concludes that the heeding presumption in failure-to-warn cases under Arizona law is "closely akin to a rule of substantive law" so as to warrant application of the presumption in this case. *See* Restatement (Second) of Conflict of Laws § 134 cmt. b. *See also Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1310 (3d Cir. 1978) (holding that a presumption against suicide under Delaware law "ha[d] sufficient substantive import that it would not be routinely labelled as procedural by the Pennsylvania courts" for conflict-of-laws purposes).

presumption that the plaintiff would have read and heeded adequate warnings had they been given. *See id*. at 884.

In this instance Shell has presented no evidence to rebut the heeding presumption. *See Dole Food*, 935 P.2d at 884 (finding a genuine issue for trial where "the evidence [did] not show beyond dispute that [the plaintiff] would have ignored adequate warnings from [the defendant]."). *See also Pavlik v. Lane Ltd./Tobacco Exporters Int'l*, 135 F.3d 876, 884 (3$^d$ Cir. 1998) (applying Pennsylvania law) (explaining that, to get past the heeding presumption and to a jury, the opponent of the presumption need only introduce evidence sufficient to support a finding contrary to the presumed fact; to prevail on summary judgment, however, the defendant must satisfy a more substantial burden, namely, the record must show that a reasonable factfinder would be bound to find that the plaintiff was fully aware of the risk or, otherwise, there is a genuine issue of fact for the jury). In fact, the evidence of record suggests that Mr. Lambert is not a reckless person and that, had he been given adequate warning of the toxicity of benzene in JP-4, he would have heeded it:

> Q. Do you know of any other person or coworker that you worked with during the course of your career as a jet engine mechanic who has developed chronic lymphocytic leukemia?
> A. No, sir. I'm still looking for all my troops that worked under me that I was responsible for, that it's my fault. Because if they come up with it, it's my fault for them not having respirators.
> I'm still looking for three kids in Ohio and a couple other kids that worked for me during them time periods that I haven't found yet.
> Q. You have done some sort of investigation to try to locate other people that you worked with during the course of your military career?
> A. To find out if they are safe and have them check themselves. Get checked.

Def. Shell Oil Co.'s Mem. Law Supp. Mot. Summ. J., Ex. B. In light of the evidence in this case of a complete lack of warning regarding the toxicity of benzene in Shell's JP-4 fuel and Arizona's heeding presumption, the Court declines to grant summary judgment.

### D. The Military Contractor Defense

As discussed, one of the bases for federal subject matter jurisdiction in this case is 28 U.S.C. § 1442 and, correspondingly, Shell asserts as grounds for summary judgment the so-called "government contractor defense" or "military contractor defense." In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Court held that a private contractor may invoke a federal affirmative defense to potential liability under state law for design defects in the military equipment that it produces for the United States, provided that the contractor can show that: (1) the United States approved reasonably precise specifications for the equipment; (2) the equipment conformed to those specifications; and (3) the contractor warned the United States about any dangers known to the contractor but not to the United States. *See id*. at 512. According to the Court, the first two conditions assure that the United States actually considered and approved the design in question, placing the suit in the area of "discretionary function." *Id*. The third condition creates an incentive for manufacturers to disclose known risks in the design or manufacture of the equipment. *See id*. The elements of the test ensure that there exists a "significant conflict" between a federal interest and state law warranting the displacement of state tort law. *Id*. at 509.[3]

To prevail on the military contractor defense, a defendant bears the burden of proving all three elements of the *Boyle* standard, *see Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), which means in the context of summary judgment that the defendant must prove the elements of the defense "to such a degree that no reasonable juror could find otherwise." *Shurr v. A.R. Siegler, Inc.*, 70 F. Supp. 2d 900, 915 (E.D. Wis. 1999). At issue here are the first and third

---

3. The military contractor defense is a matter of federal common law which displaces state law. *See Boyle*, 487 U.S. at 504, 512; *Zinck v. ITT Corp.*, 690 F. Supp. 1331, 1333 (S.D.N.Y. 1988).

elements of the *Boyle* test. Specifically, the Lamberts' counsel contends the United States did not approve reasonably precise specifications for Shell's JP-4 fuel because the specifications are silent as to the benzene content of the fuel. Also, the Lamberts' counsel argues that there are genuine issues for trial concerning whether Shell warned the United States about any dangers known to the contractor but not to the United States.

Turning first to the issue of reasonably precise specifications, this requirement does not mean, as the Lamberts' counsel urges, that the United States must exercise discretion with regard to the specific feature alleged to be defective. In *Stout v. Borg-Warner Corp.*, 933 F.2d 331 (5th Cir. 1991), the court held that, with regard to the first element under *Boyle*, a contractor need only show governmental approval of the overall design of an allegedly defective product. The plaintiffs in *Stout* had argued that specifications for an air conditioning unit were not reasonably precise because they did not specifically prohibit the contractor from installing a safety device. The Fifth Circuit found that the government's thorough review of the overall specifications constituted appropriate approval of reasonably precise specifications. *See id*. at 336. *See also Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3[d] Cir. 1993) ("[T]he government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply.").

Also, numerous courts have held that the first element under *Boyle* may be established if long-term governmental use of a product is shown. *See, e.g., Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 88-89 (2[d] Cir. 1993) (government approval sufficient to meet the requirements of the military contractor defense is shown, even after completion of the design stage of the product, where the government, having knowledge of the product's alleged design defect, reorders the specific product

to use for replacement purposes); *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 950 (4th Cir. 1989) (long-term government experience with a product is one of the ways in which to establish approval of reasonably precise specifications for purposes of the military contractor defense); *Haltiwanger v. Unisys Corp.*, 949 F. Supp. 898, 904 (D.D.C. 1996) ("[L]ong-term use of a given design often indicates de facto acceptance of the design and thus constitutes approval for purposes of the *Boyle* test. The continued and consistent use of a product without grievances or modifications implies endorsement of the design and consent as to its production and operation."). In light of the fact that, according to the Lamberts' own allegations, Shell supplied JP-4 fuel to the United States for at least seven years, and the fact that the United States, having expressly reserved the right to test and inspect Shell's JP-4 upon receipt of the product, never rejected or demanded modification of the product, there are strong indicators in the record that the United States approved reasonably precise specifications for purposes of the military contractor defense.

However, while skeptical about the Lamberts' challenge to the first element of the *Boyle* test, the Court is mindful that the applicability of the military contractor defense in a given case is an essentially factual inquiry. *See Ruth v. A.O. Smith Corp.*, No. 1:04-CV-18912, 2005 WL 2978694, at *7 (N.D. Ohio Oct. 11, 2005) (quoting *Beaver Valley Power Co. v. National Eng'g & Contracting Co.*, 883 F.2d 1210, 1217 (3d Cir. 1989)) (noting that "the inquiry regarding whether 'the government actually considered the particular specification' is 'a factual one, and conclusions will, of course, vary greatly according to the circumstances.'"). Furthermore, the Court concludes that there are genuine issues for trial as to the third prong of the *Boyle* test. The record in this case is very poorly developed as to what the United States knew about the toxicity of benzene in JP-4 fuel manufactured by Shell. As has already been discussed in addressing Shell's sophisticated purchaser

defense, although Shell asserts that the United States had knowledge of the toxicity of benzene in JP-4 based on studies it had conducted, those studies are not before the Court. There is essentially no evidence before the Court regarding what the United States knew or did not know about the toxicity of benzene in JP-4 manufactured by Shell. Moreover, as has also been discussed in addressing Shell's sophisticated purchaser defense, the evidence of record suggests that, having given no warning to the United States for nearly three years after Mr. Lambert's first exposure to JP-4 fuel manufactured by Shell, Shell dissembled about the toxicity of the product in the 1985 MSDS it issued to the United States. Where reasonable minds could differ, "whether the facts establish the conditions for the [military contractor] defense is a question for the jury." *Boyle*, 487 U.S. at 514. The Court has, of course, the power to reassess Shell's military contractor defense after all of the evidence is presented at trial and, if appropriate, to enter judgment in favor of Shell, *see* FED. R. CIV. P. 50, but the Court concludes that it cannot enter summary judgment in Shell's favor at this time.

### E. Evidence of Mr. Lambert's Exposure to JP-4 Manufactured by Shell

Finally, Shell argues in its reply brief in support of its motion for summary judgment that the record fails to show a genuine issue as to whether Mr. Lambert was exposed to JP-4 fuel manufactured by Shell while stationed in Arizona. Arguments raised for the first time in a reply brief are not favored, *see, e.g., Auto Owners Ins. Co. v. LA Oasis, Inc.*, No. 2:04 CV 174, 2005 WL 1313684, at *10, *14 (N.D. Ind. May 26, 2005); *Casio Computer Co. v. Noren*, No. 00 C 1428, 2001 WL 893813, at *4 (N.D. Ill. Aug. 6, 2001), but for the sake of completeness the Court will address this argument.

In the Court's view, the record clearly shows an issue of fact as to whether Mr. Lambert

worked in hazardous proximity to JP-4 jet fuel manufactured by Shell. Mr. Lambert specifically testified that Shell was one of the fuel manufacturers whose tanker trucks routinely delivered fuel to the base in Arizona where he was stationed:

> Q. Do you have a recollection during those last six years of any particular manufacturers of JP-4 jet fuel being on that base during those six years?
> A. Yes, sir, I do, but they had changed. It was no longer Conoco or Amoco. It was Shell, there was Arco, and there was a little tandem job called Maytag.
>
> * * * *
>
> Q. During these six years how did the JP-4 make its way onto the base?
> A. I believe – in fact, I'm positive it was trucked. 18-wheelers.
>
> * * * *
>
> Q. Can you tell me, with respect to Shell, how is it that you specifically recall that they were Shell tankers that were coming in?
> A. Great big Shell letters on the side of the 18-wheelers.
> Q. On the side of the 18-wheeler itself or the tank?
> A. The tank, sir. I'm sorry.

Def. Shell Oil Co.'s Reply Supp. Mot. Summ. J., Ex. A. Mr. Lambert testified that the Shell tanker trucks delivered fuel to a "fuel farm" on the base:

> Q. Just so that I am clear, you observed Shell tankers, 18-wheeler Shell tankers delivering a product to the fuel farm at Yuma, Arizona, correct?
> A. Yes, sir.

*Id*.

Mr. Lambert testified at his deposition that the fuel stored at the "fuel farm" was primarily JP-4 fuel:

> Q. Other than JP-4 fuel, are you aware of any other product that was stored in the bladders at the Yuma, Arizona fuel farm?
> A. In the latter years, sir, there probably was some JP-5, or 7, or 8. Something above that.
>
> * * * *

> Q. When you say in the latter years, describe for me what you mean by the latter years.
> A. '86, '87, '88 maybe.

*Id*. Mr. Lambert testified that, after delivery by Shell's tanker trucks, fuel from the fuel farm was delivered by subcontractors to Mr. Lambert's work station:

> Q. So you observed Shell tanker trucks delivering fuel to the fuel farm on the Yuma, Arizona base between 1983 and 1987?
> A. Yes, sir.
> Q. Then you would observe some subcontracting company delivering fuel from the fuel farm to where you were working at the power plant?
> A. Yes, sir, on the flight line.

*Id*.

The Court concludes that Mr. Lambert's testimony creates a genuine issue for trial as to whether he was exposed to JP-4 fuel manufactured by Shell. *See Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 523-24 (5th Cir. 1984) (holding that the evidence was sufficient to sustain a judgment for a shipyard worker allegedly injured by asbestos where co-workers testified that the defendants' products had been used on ship hulls where the plaintiff had also worked, despite the fact that the plaintiff could not recall the defendant's products being near him at work and despite the fact that there was no direct evidence that the plaintiff had worked in the hulls during the times that defendants' products were being used on those hulls); *Ecklund v. GAF Corp.*, 766 F. Supp. 384, 386 (W.D. Pa. 1991) (denying summary judgment where the record showed that the plaintiff was a professional plumber/pipefitter who worked at various industrial jobsites where asbestos was used, that during his employment the plaintiff installed asbestos-containing metal-encased gaskets in steamlines and waterlines, that amounts of dust were created in the installation of the gaskets which the plaintiff was forced to breathe at a distance of zero to ten feet, and that he recalled seeing the name of one of the defendant manufacturers embossed on the asbestos-containing metal-encased

gaskets which he installed at various jobsites). The Court is not persuaded by Shell's challenges to Mr. Lambert's testimony on the grounds that, for example, Mr. Lambert never asked the drivers of Shell's tanker trucks or the drivers of the trucks which brought fuel from the fuel farm to his work station whether they were carrying JP-4 manufactured by Shell. These matters are certainly grist for cross-examination at trial, but at this juncture they implicate questions about the weight and credibility of Mr. Lambert's testimony that the Court cannot evaluate in ruling on Shell's request for summary judgment. Therefore, summary judgment will be denied.

## CONCLUSION

For all of the foregoing reasons, Shell's motion for summary judgment (Doc. 88) is **DENIED**.

**IT IS SO ORDERED.**

DATED: 4/5/06

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge
